May it please the Court, there are two issues in this case. First, whether the evidence is insufficient to support Mr. Zamora-Salazar's convictions for conspiracy to import and for importing methamphetamine. Second, whether the District Court reversibly erred by imposing an enhancement for obstruction of justice. With regard to the first issue, the evidence is insufficient to support Mr. Zamora-Salazar's convictions. This case is governed by United States v. Paul, where this Court held that a conviction for importing drugs requires proof that the defendant knowingly played a role in bringing drugs from a foreign country into the United States, and a conviction for conspiracy requires proof that the defendant agreed to import drugs into the United States and knowingly and voluntarily participated in the agreement. In Paul, the Court found the evidence was insufficient even though the two defendants went to a ship in New Orleans to pick up cocaine that had been shipped from Guyana. The first defendant was arrested after he picked up the cocaine, and the second defendant was arrested in a hotel room with $10,000 and directions to the ship. As in Paul, the evidence was insufficient here because the government failed to prove that Mr. Zamora-Salazar knowingly played a role in bringing the drugs into the United States and agreed to do so. I point the Court, although I'll go through the evidence and I'd like to point the Court to record page, ROA page 830, the government's closing argument, where the government argued that it basically admitted the importation was committed when the UPS truck crossed the border into the United States and the air conditioning unit arrived at the port of entry, and that the person who shipped the air conditioning unit committed the offense of importation. The government then goes on to try to tie Mr. Zamora-Salazar, who was in Houston throughout this case, to the importation and the conspiracy to import, but the evidence is insufficient. And I think, given the government's admission, that's the end of the ballgame. The evidence here is insufficient because it shows only that Mr. Zamora-Salazar gave his half-brother a ride to Hill Road to pick up the AC units after the agents had replaced the methamphetamine with mud at the border. And he did the same thing a week earlier with a box that contained a water cooler. The person who received the methamphetamine in Houston, Cruz Becerra, said he never, or testified he never communicated with Mr. Zamora-Salazar and never told anyone the packages came from the United States. Mr. Zamora-Salazar never exited the vehicle on the first pickup, and he only exited the vehicle on the second pickup to open up the tailgate. The agent in the case testified that Cruz Becerra communicated with his cousin in Mexico on WhatsApp, but that there was no communication between Zamora-Salazar and Victor Becerra in Mexico on WhatsApp, that there were no phone calls between Zamora-Salazar and Cruz Becerra, and there was no evidence of phone calls or discussions between Mr. Zamora-Salazar and anyone showing any knowledge of importation or intent. And as in this Court's case in Campos and the Eleventh Circuit's case in Bollinger, whatever knowledge Diaz had, if any, of the importation cannot be imputed to Mr. Zamora-Salazar. Mr. Tucklow, the government tries to distinguish Paul by saying that in this case there was a second incident, that there had been one before, so that maybe he knew what he was doing because he'd done it before, that there was labels on the package that showed it could come from Mexico, and that his co-defendant had contact, but it was because it was his cousin in Mexico, so that there was contact with someone in a foreign country. There was a label from Mexico on the package, and this was not the first time. There was evidence of a second time, and that distinguishes it from the Paul decision. Could you comment on that? Sure. First, the first package with the water cooler in it was never recovered. So what label was or wasn't on the package is not in evidence. It's just the Cruz Becerra testified that it came to his house, and I think the agent testified that they never recovered the package. So there's no evidence of any label on that package. Second, the only evidence about the label on the package when Mr. Zamora Salazar was involved with the package is that from aerial surveillance, they saw Cruz Becerra and Diaz messing with the package, and then there was cellophane on the ground. But there was no one there saying whether he saw the label on the package. But in addition, the evidence still, even if he saw the label on the package, the evidence would be legally insufficient because as in Paul, I mean, let's go back to Paul. Mike in Guyana calls Paul in Britain in New Orleans and says the ship is coming into New Orleans, pick up the cocaine, and Britain does. And this court still says the evidence is legally insufficient because Paul in Britain did not play a role in the Well, let's just assume arguendo. All the government's facts are true. Britain and Paul still legally require the reversal of the conviction because it's not what you do after the fact, it's whether you knowingly and voluntarily agreed to play a role in the importation. The government cites an initial 28-J letter, which I know, I believe a motion to strike is still pending, but they cite cases that say the conspiracy continues. But those cases are completely inapposite. I mean, in those cases, all the defendants clearly were involved in the agreement to import. For example, in Gray, the defendants brought the drugs into Mississippi and transported them to Alabama. In Osgoode, the defendant was a pilot who participated in negotiations to import the drugs and delivered the imported cocaine to Alabama. The defendant was present and rented the warehouse where the imported drugs came to, and there was a discussion about where the drugs were hidden in the truck. In Bacar, there were phone calls between the defendant and the co-conspirators importing the cocaine, and the defendant was present at the heroin, and the defendant was transferred the heroin. And with regard to Reynolds, which I left off of my response to the 28-J letter in haste, I apologize, in Reynolds, the defendant was said to be the original financier of the importation of cocaine from Jamaica, and actually went to Miami to help pay for the cocaine when it came in from Jamaica. So this case is distinguishable from all those cases. And as I said, I don't think the facts show that Mr. Zamora Salazar knew that the cocaine came from outside the United States, but even if they show that he knew, Britton and Paul were given instructions to get to the ship, and one of them went to the ship, and because they played no role in the importation, they were not guilty. Now, the statement that Mr. Cruz Zamora made also shows that he had no role in the importation, because he says throughout he was working for the people who were going to receive the cocaine that was picked up in Houston. So had he been charged with possession with intent to deliver, we might have a different story. I think you just asked a $64,000 question, Your Honor, or maybe these days it's $64 million. It sure is puzzling why the government charged importation when the evidence only shows that Mr. Cruz Zamora was involved in Houston when the cocaine came across the border and stopped at a port of entry, was taken out, and mud was put in the AC unit, and agents then transported it to Houston. I don't understand it. Perhaps on remand a jury will still find him guilty, or a jury could acquit him of importation. I don't know, but I think your question is a good one for the government. For all these reasons, the evidence is insufficient. If there are no further questions on that issue, then I'd briefly like to address obstruction. With regard to obstruction, this Court's case law requires to be enhanced for obstruction of justice, the obstruction must be willful. It must be a conscious, deliberate, voluntary, and intentional attempt to obstruct justice. Here the pre-sentence report said that Mr. Zamora Salazar said to Cruz Becerra in a lockup whether he knew what happened to the family members of individuals who talk. But at trial, Cruz Becerra testified that Mr. Zamora Salazar said to him, quote, about did I know what I was doing about how there could be problems later on. Now, Mr. Cruz Becerra never said I felt threatened. He never testified I took this as a threat. He never testified I was afraid. He never testified he thought it went to his family members, or anything like that. The only testimony on this is about did I know what I was doing about how there could be problems later on. With no other context, that could be about anything in the case. As I said in my brief, it could be about why don't we get retained counsel? Why are you taking appointed counsel? Why are you and your counsel stipulating to something? It could be about anything, and we don't know. And so there's no evidence that it's a willful, conscious, deliberate, intentional attempt to obstruct justice. And the second point I would make is, the way I read the district court's comments in response to the objection, I read the court's comments as, I was there at trial, I heard the evidence, the statement is in PSR was what was said at trial, and so I deny your objection. That's how I read it. I leave it to the court to read it whatever way it thinks, but if the court reads it that way, then it was error for the court to use the statement in the PSR because the trial testimony was completely different. Your Honors, if there are no further questions, I would reserve the rest of my time for rebuttal. I will say this, not because you're an offender, Mr. Socolow, but because the FPD handles a lot of these cases, and I'll say it to the government as well, if you look at the court's website, we've recently posted on there a note about 28J fouls, and to the effect that very typically in civil and criminal cases, we get a barrage of 28Js that really are not 28J in the sense of the rule, which is really designed to bring to the court's attention recent cases, you know, a Westlaw site, a Lexus site, brand new Supreme Court case, et cetera, but in fact what we get is a counsel, in effect, supplement briefing that they've done by then citing other cases from our court that are older or other circuits, et cetera. There are so many offenders until it doesn't point at public defender, private attorneys, it's just kind of the way it is, and maybe the court's been a bit lenient, I'll put it that way, in that we don't strike them, you know, we kind of just let them be fouled, we read them, and so forth, but more recently, our court has sort of taken a different view on them, and so some of these may be stricken by the clerk of court, but my main point in saying it, again, this is not aimed at you, but just to point to the website and to FPDs and others that, filing the 28J, be sure to adhere to the rule, that it really does follow the rule, and if it doesn't, you know, file the strike and so forth like that, so if you would just, you know, sort of pass that on. Yes, Your Honor, we're aware of that, and in fact, I filed a motion to strike the government's 28J letter in this case with the court's notice attached, so it hasn't been ruled on, but No, and I'm looking at the 28Js up here, I'm looking at what the government cites, and then I also look at, you know, what you've filed, you know, you rely on a number of cases, you cite United States v. Gray, 5th Circuit, 1980. No, those are the government's cases, Your Honor, I'm responding to the government's, the government filed a 28J letter, and I just responded, but then I also filed a motion to strike the government's 28J letter. Okay, I won't belabor the point, I'll just say this, I'm reading four paragraphs in to the FPD response, which goes into the merits of the cases that the government has filed, United States v. Gray, and on. I mean, I'm looking at it. Right, because the government cited new cases for a new point that wasn't in their brief, and so I responded in saying, they're citing new cases. Okay, here's the message, Mr. Socolow, given what I just said, rather than responding in kind, for me, a motion to strike theirs would be in order, as opposed to, before I filed a motion to strike, here's my iteration on what the cases are, that's all, I mean. Well, Your Honor, if I may explain, I filed the motion to strike in between flying to New Orleans and flying to Baltimore last week, and then on Monday, a colleague pointed out to me, he told me that this was posted on the website on June 3rd, that may or may not be correct, and so when I learned of that, this week, I filed the motion to strike. Had I been aware of the court's notice last week, I would have filed the motion to strike. I just, I understand, and from now on, I certainly will comply, and we will comply with the court's notice, and I think you're right, but, I mean, you don't need my approval, but I think it happens too much, and I think, my view is, if it's not briefed in the main briefs, and if it's not new, then too bad, it should be stricken. Well, again, my comment was not at all meant to be directed at you personally, it just came to me. I mean, 28J, you know, in its old case, and then its point, and most times, we just read it, you know, ignore it, but I'm just saying, henceforth, there probably will be more of these that are stricken only on the court's own motion, as opposed to there necessarily being a motion filed by somebody else, or the clerk will reject them, and all I'm saying institutionally is just be informed of that, not so much a comment on whether this one is stricken or not, but just because, you know, you all file a lot, and again, I'm not talking about just criminal cases, I would say it's probably flaunted more in civil cases than it is in the criminal cases, particularly filing 28Js of other circuits that are old cases and so on and so forth, so, no, I appreciate your comments on it, and being up to speed on it. And we understand, Your Honor, and we will comply, thank you very much. Thank you, and you've reserved your rebuttal time. Thank you. All right, Mr. Howard, did you charge the right offense, or are you trying to make a square peg fit into a round hole with the way that you charged in this case? Are you looking for the court to bail you out of a charging impasse, or does the evidence really fit the crime charge? Your Honor, Chris Howard on behalf of the United States, to answer your question, the evidence showed, and the evidence was sufficient to convict and to affirm the convictions with respect to the importation. The case was properly charged, and as shown by the evidence, and certainly as shown by the jury's verdict, the charging decision was a prescient one. And again, Chris Howard on behalf of the United States, viewed in the light most favorable to the government, there was sufficient evidence that Zamora Salazar knowingly participated in the conspiracy to import methamphetamine from Mexico to his residence on Warwick Road in Houston, Texas. There was also sufficient evidence that Zamora Salazar aided and abetted the importation by retrieving the drug shipments and transporting them towards their final destination. First with respect to the conspiracy to import conviction, the jury heard from Mario Cruz that Cruz had agreed with his cousin Victor in Mexico to receive shipments of methamphetamine that were being sent from Mexico to Cruz's residence at 157 Hill Road. The jury also heard evidence that Zamora Salazar was aware and had knowledge of this importation agreement. And I'd like to point the Court to three types of evidence that shows Zamora Salazar's knowledge of that importation agreement. First, the timing and the circumstances of Zamora Salazar's retrieval of those drug shipments from Cruz's residence shows a concert of activity. Second, the shipping labels and the packaging itself shows Zamora Salazar's knowledge of its foreign origin. And third, Zamora Salazar's own admissions with respect to his knowledge of the drugs and of others involved go to his knowledge of the importation agreement. Now returning briefly to the timing and the circumstances of the retrieval of the drug shipments, the jury heard from Mario Cruz, who testified that when he received that first drug shipment, he contacted his cousin Victor in Mexico, who confirmed that it was the correct package, and then Cruz received a message saying that someone would come and retrieve the package. Notably, Cruz didn't open that package, even though it was addressed to him. Then, Zamora Salazar arrives in that Escalade truck with his half-brother, Constancio Diaz, who retrieves the package. And Cruz testified... Where was that? I'm sorry, Your Honor? Where was that retrieval when they picked it up? They retrieved both packages, they being Zamora Salazar and his half-brother, Constancio Diaz. They retrieved them from 157 Hill Road, which was the address of Mario Cruz, who the drugs were shipped from Victor in Mexico to Mario Cruz. And then... Did Zamora Salazar personally assist in loading those into his Escalade? Yes, Your Honor. And that's in the second shipment he actually did. So in the second shipment, there's shown an even greater concert of activity. Because the second shipment, which was a UPS package, which was an air conditioning unit, when Cruz received it, again, he confirmed with Victor that he received it. And Victor said, in 30 minutes, someone is going to come and pick up that package. Zamora Salazar then arrived within 30 minutes, approximately 30 minutes later, again in the same Escalade truck, again with his half-brother, Constancio Diaz, to pick up that package, that second package. And what's notable about that is Cruz testified that he was aware that they had arrived to Mexico, not by opening a window and seeing that they had pulled in, but actually from a message that he received from Victor in Mexico showing that they had arrived. So there is certainly an even greater concert of activity, which really shows the individual roles here. Do we have any evidence that co-conspirators relayed that information to Mr. Zamora? I mean, we have information that his half-brother might have been aware it was coming from Mexico. What evidence is there that that was communicated to the accused in this case? And, Your Honor, when you say that was communicated, are you referencing that it was coming from Mexico? So, Zamora Salazar, there was evidence of Zamora Salazar's knowledge of its foreign origin in a couple ways. One, when you look at the shipping labels themselves, and you just heard from Appellant when he said that there was no evidence of a label on the first package. I would direct you to Exhibit 43, it's ROA 947, which is the label from the first package that the jury had. That was a FedEx shipment. It shows that it's from Mexico, and the agent testified that that was the label on the first package. To be clear, though, the first package, the packaging was not actually recovered, but the agent had subpoenaed FedEx, received those documents, and it shows the label from the first package. The second shipment, again, had a label on it, again showing that it's from Mexico. In addition to the actual shipping labels that show they're from Mexico, you also have the package itself. If you look at Exhibit 22, which is at ROA 924, it's a picture of the air conditioning unit on the back of Zamora Salazar's truck. If you look at that picture, you'll see, other than the Whirlpool logo in the top left, you'll see all the text, all the language on the exterior of that box is entirely in Spanish, which I would submit is, again, another indicator that that package came from outside of the United States. So in addition to the timing and the circumstance of the retrieval, in addition to the shipping label and the packaging itself, we also have Zamora Salazar's own admissions to agents. The jury heard how Zamora Salazar admitted to Agent Prado, who testified, that he knew that there were others involved, that he knew who the ultimate recipients were, and that he knew the air conditioning unit contained methamphetamine. So all of that, when you look at the circumstances of the retrieval, the timing of it that shows the concert of activity, when you look at the shipping labels and packaging which shows its foreign origin, and when you look at his own admissions to agents regarding his knowledge of other individuals involved and knowledge of the drugs, we would submit that that was sufficient evidence of his knowledge with respect to the importation agreement. We also had to prove that he participated. So not only that there was an agreement, that he knew of the importation agreement, but that he participated in it. There's a number of participatory acts that Zamora Salazar took. Let me ask you a question before we go there. With respect to the defendant's knowledge, what was the specific jury charge? Was it the pattern charge, or was there a specific charge relative to knowledge given the charge yesterday? Your Honor, my understanding is it was the pattern instruction. Okay. But with regard to Zamora Salazar participating in this conspiracy, he lowered the tailgate to help load the AC unit, Your Honor. He transported the packages from the pickup site towards the final destination. And to be clear, Mario Cruz's residence was not the final destination of this package. And I think that's a key point with respect to appellant argues that he was not the one that brought it into the United States. Well, what the cases from this circuit have made clear is he need not be. The importation offense does not end once drugs get one inch into the United States. The importation offense, whether it's a 952 or 963 conspiracy, extends all the way until its final destination. Whether that final destination is New York, which it was in the United States v. Pekar, whether it's Greensboro, North Carolina, which it was in the United States v. Reynolds, whether it was Alabama, which it was in the United States v. Gray, the importation continues and every link in the importation continues until those drugs reach their ultimate destination. We would submit to you Mario Cruz's residence was not the final destination for those drugs, and we know that in a couple ways. One, even though the drugs are addressed to him in these shipments, he doesn't open them. When he gets them, he holds them for really a short period of time, and then Zamora Salazar comes and retrieves them. And what does Zamora Salazar do once he retrieves them? Takes them back to his house on Warwick Road, opens the package. So I would submit that opening the package shows where the final destination is, and that it's at the very least at 1450 Warwick Road, not at the Hill Road address where Mario Cruz was. Another important, I think, fact when looking at where is the final destination is to look at money. There was no exchange of money when Zamora Salazar came and picked up these drugs, which shows again that he's a link in the importation chain rather than picking up drugs who've reached their final destination. So to be very clear, while they argue that, oh, this court has said you have to bring in the drugs, you don't. You have to be a link in the importation chain, and you're aiding and abetting by getting it towards its final destination. Counsel has argued the Paul case is instructive here. What's the government's response? It's a couple of facts here make that distinguishable and make it significantly different. And Paul, the defendants in that case, weren't contacted regarding the drug delivery until after the vessel reached the United States. But here, we have Zamora Salazar's involvement in the conspiracy, involvement in the participation, even before that UPS package entered the United States. Because again, the second package, which was a UPS package, entered the United States on April 2nd. On April 1st, Zamora Salazar had already gone and retrieved a drug shipment for Mario Cruz. So we have his involvement that predates that second package ever entering the United States, which is significantly different than Paul, which again, they weren't contacted until the vessel had already reached the United States. So you have a series of drug shipments here, unlike in Paul, where it was just one. So it was certainly reasonable to infer Zamora Salazar's involvement before those drugs even crossed the border. There were also no facts in Paul to indicate that the ship or the packaging made it clear that it had originated outside the United States. Here, as I mentioned, the shipping labels and the packaging show that those drugs came from Mexico. There was also no evidence in Paul, I'm sorry, there was no evidence in Paul that the defendants there were even aware of the shipment until Mike and Guyana had called them to retrieve it. And I think the dates in Paul are important. Because in Paul, that ship arrived on February 8th, and the defendants, Paul and Britton, Paul wasn't even contacted until four days after it had arrived, February 12th. Britton doesn't even get involved until February 13th, five days after that vessel arrived. Compare that to really the contemporaneous concert of activity here, where we're talking about a period of minutes between when Cruz gets that package at his residence at 157 Hill Road, and when Zamora Salazar comes, 30 minutes later. So there's much more of a contemporaneous concert of activity, combined with the fact that he had engaged in a series of transactions, which the jury could reasonably infer that shows Zamora Salazar's awareness of that shipment, even before it got to the United States. Also in Paul, the court took note that the evidence there was insufficient that the defendants agreed to participate or play a role in bringing cocaine into the United States. Here, Zamora Salazar's role, again, he was not the one carrying it across the border, and he need not be. His role was to retrieve the package, help with its loading, transport it towards its final destination. He didn't bring money to exchange for the drugs, unlike in Paul, which again, I think the transfer of money, where Gavin Paul's job was to bring money and the drugs were going to be given to someone else, that's not what Zamora Salazar did. There was no exchange of money, which, as I mentioned, is an indicator that Mario Cruz's final destination. So those are, I would submit, the key differences between this case and United States v. Paul. There was also the sufficiency of the evidence with respect to the aiding and abetting. Now this court has recognized that typically the same evidence that supports a conspiracy to import will also support an aiding and abetting, and that's really what you have here, a number of overlapping facts, which show that defendant associated with this criminal venture, again, he knew the package contained methamphetamine, the packaging showed its foreign origin, and when you look at the circumstances of Zamora Salazar's arrival at Cruz's residence both times. Also defendant participated in the venture, he sought by action to make it succeed when you look at his participatory acts of transporting the package from Cruz's residence towards its final destination, lowering the tailgate to help load the air conditioning unit containing meth, and then opening the air conditioning unit once it arrived home, once it arrived to Zamora Salazar's home. Now I do want to address something that Chief Judge Stewart, you had mentioned regarding the Rule 28J. I think our office certainly endeavors to provide this court with the legal authority it needs to render a decision in our response briefs. I don't know why these cases were not addressed in the government's response brief. They ought to have been, particularly as Appellant pointed out, these cases were, had been issued and were available at the time the government filed its response brief, but this, the 28J does not raise new arguments. It provides legal authority for the arguments that's already in the government's brief. Well, that's true, but you need not go any further than the first statement you made. Understood, Your Honor. I mean, it's sort of two-fold. If it's making new arguments, that would be an independent basis to reject it. Correct. The point you made is exactly that. I mean, it cites United States v. Grace, 626 F. 2nd, 494 Fifth Circuit, 1980. Correct, Your Honor. You know, so I mean, that's a long way off. And the other cases cited in here, 1999, 2000, and it's not like just one case. You know, it's a lot. There's a case cited, United States v. Reynolds, 511 F. 3rd, 603 Fifth Circuit, 1975. So, you know, it's, well, anyway, you're not making on it, but I mean, it's not going to sell, you know, that whoever did the response brief that these cases weren't available or that the issues, you know, weren't raised. But I think you get the point, and again, I'm not pointing at you or Mr. Socolow. I'm just doing my duty as Chief Judge of the court to elaborate on what the court has agreed to do and is on the website for whoever briefs cases and so forth. And I understand their divisions of labor and all that, but just for you to know that, you know, it's there. And so, if it's, we wouldn't want a case to turn on and fail you to provide the court with the appropriate information because it's rejected. On the other hand, vigilance can be made. Now, we all know there will be situations where some case, you know, it's a 2017 case, a panel put out last week, somebody missed it, arguably could be in. But those will take care of themselves. But these cases that are two decades old don't get in by any stretch. And that's the main point here, vigilance of whoever does the brief writing, appellate review, etc., to just not send those up. And the other point I was making, Mr. Socolow, we're not going to wait on the other side to file a motion to strike. That they're subject to a sua sponte rejection by the clerk's office of and in the first instance. And that's the other point I wanted to be made. So, there won't be, well, you don't strike ours, we won't strike yours, you see what I mean? And have, but anyway, point well taken. I don't belabor, you got the message and he did as well. And our office is certainly aware of the important note that was issued by the court, I believe last Friday, and it's been distributed within our office. Just briefly, with respects to the second issue, which is the obstruction, it's the government's contention that that finding was plausible, particularly when you look at the context and the content of what's being said in that holding cell. So Zamora Salazar had sat in a courtroom on April 20th and listens to Special Agent Gonzalez testify about how Mario Cruz had provided information to the public. In particular, Zamora Salazar listened about how Mario Cruz had identified Zamora Salazar as the driver in both of those drug shipments that he came and retrieved that. With that information then, nearly a month later, Zamora Salazar finds himself in a holding cell with the person who had provided information to the government. The government then filed a 404 notice before trial, alerting to the court of this conversation. And then the PSR then summarized, not Zamora Salazar's testimony, the PSR summarized the 404 notice, which the 404 notice provided the court with the date, a summary of what had been said, the threat that had been made. And certainly when the court who had the 404 notice, who had been present at sentencing, and even taking the version that was presented by defense counsel at sentencing, we would submit that that finding was plausible in light of the record as a whole. Also it's important to note that Zamora Salazar, he didn't meet his burden of offering any rebuttal evidence to argue that the PSR itself was somehow untrue and accurate or unreliable. And the PSR's version doesn't necessarily conflict with the trial testimony. In the appellant's brief, they point to cases where there is some kind of material difference between what was the trial testimony and what the sentencing court relied on. Here you don't have any material irreconcilable differences. When you compare the version that was presented to the court at sentencing, which was generally accurate, to the version that's summarized in the 404 notice in the PSR. And lastly, the district court did not credit the PSR's version over the trial testimony. The district court specifically said after the defense counsel had summarized what had been testified to, the district court said let's assume that's as close as we can, meaning let's assume your version is as close as we're going to get. And then the court went on to say, and the court, and the government went on, I'm sorry, I'm out of time. Finish your sentence. The government went on then to justify that even under the version presented by the defense counsel that the obstruction enhancement was appropriate. All right, thank you. Thank you. Thank you, Mr. Howell. Okay, back to you, Mr. Sokol. Mr. Honor, there are two main, well, there's more than two main points I want to make. But first, well, let me first start with by saying the government is correct. They're correct that I overlooked that the shipping label from the first package was subpoenaed. And my argument was going off of the agent testifying that the package was never recovered. So the government is right that they did have the first shipping label. I just wanted to correct that. But if the government is correct that, were the government correct that the conspiracy continues until the package gets to its final destination and that you can play no role in the importation but can be convicted if you play a role after it's imported, then you could not possibly have the result in Paul. Because Paul in Britain would have been guilty even though they played no role in the importation because they went to get the cocaine from the ship. So the government cannot be right. That is not what Paul stands for. And by the way, and I don't read Paul as saying it matters whether it's 15 minutes after the cocaine gets here or the meth gets here or three days or four days. Once the importation is complete, it's completed. The government also mistakes aiding and abetting with accessory after the fact. They're arguing that Mr. Zamora is guilty of aiding and abetting, but what they're really saying about the facts is that he was an accessory after the fact. But he was not charged with that, and that's not a lesser included. Mr. Sokoloff, we have a jury verdict here, and you got to look at it, I guess, in a more favorable way that is there enough to support and back up the jury verdict. And there's, I guess, some circumstantial evidence there. And how do we, is the burden harder, I guess, to overturn a jury verdict in this case? Do you still think there's enough there to say there's just nothing here that shows that he had knowledge of importation? Yes, Your Honor. I think a reasonable juror would have to have a reasonable doubt about conspiracy to import and importing. And I think it's important to, as you said, put on one side conspiracy to possess with intent  versus importing conspiracy to import. What are the facts that he played a role in the importation and entered an agreement and voluntarily participated in an agreement to import, not to possess with intent to distribute, not conspired to possess with intent to distribute? And I think that the facts are insufficient. There's nothing showing that he did anything to get the cocaine, the meth, to the United States. There's nothing showing he agreed for the meth to come into the United States, especially since, as I understand it, meth is made in various places in the United States through, I think. But the- There's no claim of error here about the jury instructions that were given to the jury. So having said that, is there any argument about the quality, quantity, or sufficiency of the evidence that you're making today that was not made to the jury in the trial? Your Honor, I have to go back and look. The motion for judgment acquittal was on point with exactly what I'm saying here today. Well, that's what I'm asking. I'm saying, given that we don't have an issue in the case about the jury was given the wrong charge, the jury wasn't charged this, there's no jury charge issue in the case. So taking your sufficiency argument in light of the question, Judge Prado, I'm only asking, isn't your argument to us, the panel, fully the argument and presentation that was made below in the jury trial itself? I believe it is, but I don't want to affirm that without re-looking at the record, Your Honor. I can't remember the specific argument that was made to the jury. I'm just being honest, but- Well, my question doesn't go to the word for word. My question goes to, is there an aspect of the insufficiency argument you're making to the panel that was not made to the jury in order for us to be convinced that no reasonable jury, looking at this evidence, could convict your client? I'm not asking you to recite verbatim what the evidence was. Your Honor, I can't answer because I don't recall. I'd be happy to submit a letter to the court. No, you don't need to submit a letter. I didn't expect the response that you're giving me. I mean, I'm not trying to ask you a trick question. I just wanted to know, in other words, if you're arguing that, in essence, the jury, the government charged them with importation instead of charging them with something else. Therefore, the jury on this evidence could not convict. I'm just asking if trial counsel made in effect that argument as a way of attempting to gain an acquittal below. That's all I'm asking. I believe he did. I know for sure he made the exact argument to the court in a motion for a judgment of acquittal, which is on review here. And I believe he also made it to the jury. If you want a 100% positive answer, I'd be happy to write the court. No, you don't need to write me. We're going to read the record. I simply ask because you're here on oral argument. And you're passionately and coherently making an argument to the panel that the evidence was insufficient. Judge Prado asked you, this was a fully tried jury case. And given the standard of deference to a jury, I was simply following it up to ask if there was any aspect of your insufficiency argument made to the panel that was not received and appreciated by the jury below. That's all I was asking. I don't believe so, Your Honor. But I'm willing to stand corrected. I mean, that's fine. I mean, we're going to read the record. You know, we're going to decide the case based on it. I just wanted to know why I had you here, because you do an excellent job in preparing an organic case. So that's fine. Okay, thank you, Your Honor. All right, thank you both of you. Very knowledgeable about the case. Appreciate your briefing and argument, and appreciate your candor about the questions I ask about 28J and so on and so forth. All right, the case will be submitted. We call up the next case.